UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

TOMMIE RICE, ON BEHALF OF          CIVIL ACTION NO.  13-0362
THE MINORS, CIR AND GMR

VERSUS                             JUDGE ROBERT G. JAMES

CORNERSTONE HOSPITAL OF            MAG. JUDGE KAREN L. HAYES
WEST MONROE

## RULING

Pending before the Court are cross motions for summary judgment filed by Plaintiff Tommie

Rice ("Rice") [Doc. No. 90] and Defendant Cornerstone Hospital of West Monroe ("Cornerstone")

[Doc. No. 97].

For the following reasons, Rice's motion is DENIED, and Cornerstone's motion is

GRANTED.

## I.    FACTS

This case arises out of the medical treatment of Joshua Rice ("Decedent") prior to his death.

Decedent was Rice's son and the father of two minor children, CIR and GMR.

In 2007, the Decedent was involved in a single vehicle accident.  His vehicle flipped several

times, and he suffered serious injuries, particularly to his abdomen.  From the time of his accident

until his death, Decedent was hospitalized numerous times, only returning home for a total of a few

months.  During this time, he underwent over twenty abdominal surgeries.  Decedent had a large

colostomy with multiple fistulas[1] and possible short gut syndrome, requiring total parenteral nutrition

---

[1]The Decedent's physician at Nebraska Medical Center, Dr. David Mercer, explained the
Decedent's wounds in lay man's terms:

Josh had a severe accident which caused multiple injuries in his abdomen, and as

("TPN").[2] He also later developed and suffered from complex medical conditions, including renal disease, osteomalacia, metabolic bone disease, and sepsis.

Between May 2011 and September 14, 2011, Decedent was hospitalized at Nebraska Medical Center for evaluation for a possible small bowel transplant and/or repair of his fistulas. He underwent multiple surgeries there. When Decedent was released, he was able to walk some.

On December 5, 2011, Decedent was admitted to St. Francis Medical Center for a catheter-related blood stream infection, nausea, vomiting, and fever. On or about December 14, 2011, Decedent was transferred to Cornerstone for continued treatment, wound care, colostomy care, TPN, and rehabilitation. He remained at Cornerstone until January 24, 2012.

While at Cornerstone, Decedent was seen by two physicians who were independent contractors, Dr. Michael Lawson and Dr. Donna Donald. When he first arrived at Cornerstone, Dr. Lawson found him to have "[s]evere debility, essentially bed-bound with severe weakness," and ordered a rehabilitation program. [Doc. No. 99-2, p. 3].

Decedent was provided physical and occupational therapy sessions, but "most of the time," he refused to participate. [Doc. No. 97-24, Deposition of Cole Padgett ("Padgett Depo."), p. 10].

---

a complication of that, not all of his intestines healed well on the inside.

> And when intestines don't heal appropriately on the inside, they will sometimes come up to the surface of the skin, and so then the . . . feces, instead of going out the bottom end, the way it should, comes out the front of the abdomen, and we call that an enterocutaneous fistula.

[Doc. No. 99-18, Deposition of Dr. David Mercer ("Mercer Depo."), pp. 7-8].

[2]"Total parenteral nutrition (TPN) is a way of supplying all the nutritional needs of the body by bypassing the digestive system and dripping nutrient solution directly into a vein." http://medical-dictionary.thefreedictionary.com/total+parenteral+nutrition, last visited 02/09/2016.

Between January 7 and 20, 2012, because of his end stage renal disease, Decedent also underwent hemodialysis at the Fresenius Unit located in Cornerstone.  The Cornerstone procedure for moving patients unable to walk or unable to sit in a chair for the duration of the dialysis was to move the patient in his bed to the unit and then return him in his bed to the patient room.

Rice contends that, on some unidentified date in January 2012, Decedent's right leg became entangled when two nurses or aides were transferring him from a cart to the bed using a draw sheet. He alleges that during this transfer Decedent suffered fractures to his right hip and left shoulder. Neither the Decedent nor his parents reported this incident to any employee or contractor of Cornerstone.  No incident report exists, and no contractor or employee of Cornerstone testified that he or she was aware of this alleged incident.

On or about January 10, 2012,[3]  Decedent complained of severe shoulder pain to an occupational therapy assistant, Laurie Hendrix ("Hendrix").  According to Hendrix's notes, she discussed the "need for [a] possible x-ray to the left shoulder" with a nurse.  [Doc. No. 99-12, Hendrix Depo., p. 9].  However, Decedent did not tell Hendrix of any incident which caused him injury, when he was being transferred or otherwise.  *Id.* at p. 12.  Once Hendrix told the nurse of Decedent's shoulder pain, the nurse should have discussed the need for x-rays with a physician.

There is no notation to indicate that the nurse discussed Hendrix's concerns with one of

---

[3]Rice initially referred to a January 5, 2012 complaint [Doc. Nos. 90-1, p. 6; 90-2], but Decedent's physical/occupational therapy notes indicate that he complained of shoulder pain on January 10, 2012. [Doc. No. 99-29, Padgett Dep., p. 11 ("There was one day where we treated him and he complained of generalized pain in his legs.  Most of the time he did complain of pain. . . And then . . . that day he complained about his shoulder.  That was on the 10th, I believe, of January of 2012.").  In his Summary of Disputed Facts, Rice states that "the left shoulder injury to [Decedent] occurred at Cornerstone . . . on or about January 10, 2012." [Doc. No. 120-6].

Decedent's doctors.  However, on January 11, 2012, Dr. Lawson's notes indicate that he was aware of Decedent's complaints of pain in his left shoulder. [Doc. No. 97-3, p. 5].  When Dr. Lawson examined Decedent the following day, January 12, 2012, his notes indicated that Decedent "feels better." [Doc. No. 97-3, p. 4].  Neither Decedent nor his parents ever told Dr. Lawson, or his other treating physician, Dr. Donald, about any bed transfer incident.  Neither of the doctors ordered x-rays based on their examinations and the complaints he did make.

Hendrix's occupational therapy notes reflect that on January 12, 2012, the Decedent performed upper body exercises and that on January 18, 2012, he used the trapeze bar to lift his upper body.

There is no evidence that Decedent complained of pain specific to his right hip while at Cornerstone, although he did complain of generalized pain in his hips and knees.  Cornerstone points to medical records and testimony that Decedent constantly complained of pain during his stay there, even before the date of the alleged incident, particularly to his joints.  Decedent received daily doses of Dilaudid[4] and Benadryl,[5] as well as other pain medication on occasion.

On January 24, 2012, Decedent was transferred in an ambulance operated by American Medical Response ("AMR")[6] to the Vascular Access Center for outpatient replacement of his

---

[4]Dilaudid is the brandname for hydromorphone HCL, a medication used to treat moderate to severe pain.  It has a high risk for abuse.  *See* http://www.webmd.com/drugs/2/drug-9130/dilaudid-oral/details#, last visited 02/09/2016.

[5]Benadryl is the brandname for "[d]iphenhydramine is an antihistamine used to relieve symptoms of allergy, hay fever, and the common cold. . . It is also used to prevent and treat nausea, vomiting and dizziness caused by motion sickness. Diphenhydramine can also be used to help you relax and fall asleep." *See* http://www.webmd.com/drugs/2/drug-5680/benadryl-oral/details, last visited 02/09/2016.

[6]Pending before the Court is a motion for summary judgment filed by Cornerstone on the independent contractor status of Fresenius, AMR, and Northeast Louisiana Kidney Specialists,

dialysis catheter.  Physicians and/or staff at the Northeast Louisiana Kidney Specialists, LLC, were unable to replace his catheter because of a large superior vena cava thombus (clot).  Decedent was then taken by AMR to St. Francis, where he was admitted.  During his stay at St. Francis, he complained of abdominal and right hip pain, but the record also notes "years" of onset. [Doc. No. 97-4, p. 6].

Approximately three days later, on January 27, 2012, AMR transferred Decedent to Legacy Aviation where he was air-transferred by Eagle Med on a stretcher or isolette to Nebraska Medical Center, for further treatment for his abdominal issues, including consideration for a small bowel transplant.  EagleMed records indicate that Decedent complained of "right hip pain 2nd to patient being transfer[r]ed to sending facility," and St. Francis is identified as the sending facility.  [Doc. No. 97-20, p. 3].

After he arrived at Nebraska Medical Center, the Decedent complained of pain to the staff there.  On January 30, 2012, x-rays were taken that showed Decedent had fractures of the left shoulder and right hip. [Doc. No. 90-4].  The Decedent's radiologist, Dr. Richard Stemm, and orthopedist, Dr. Matthew Mormino, estimated the fractures to be approximately two to four weeks old.  However, Cornerstone's orthopedic and rehabilitation expert, Dr. Randolph Taylor, found the age of the fractures was indeterminate and that the shoulder injury appeared much older and was "likely due to the 2007 MVA." [Doc. No. 97-29, Expert Report of Dr. Randolph Taylor ("Taylor Report), p. 1].   Cornerstone's expert radiologist, Dr. Michael Hanemann, opined that the "chronology, or time of occurrence, of these fractures was not able to be determined precisely" on the January 30, 2012 x-rays but, "based on their . . . appearance. . . both fractures could have been

---

LLC. [Doc. No. 94].  Although Rice challenges the independent contractor status of the other two entities, he "concedes" that AMR is an independent contractor, and, thus, its actions cannot be attributed to Cornerstone. [Doc. No. 107, p. 3].

sustained within a few days" prior to the x-rays. [Doc. No. 99-38, Affidavit of Dr. Michael Hanemann, p. 2].

Candice Russo ("Russo"), the Decedent's former wife and the mother of his minor children, testified by affidavit that she and Rice spoke by telephone several months after the Decedent was hospitalized in Nebraska. [Doc. No. 99-39, Russo Affidavit, ¶ 6]. During that conversation, she avers that Rice stated that the Decedent broke his hip "when his arm and leg fell off of his bed while being transferred to a gurney." *Id.* at ¶ 7. She further avers that Rice told her this incident occurred "while [the Decedent] was being transferred to his flight to the hospital in Nebraska" and that he "specifically advised that the accident and injury to [the Decedent occurred while he was being moved for his flight to Nebraska." *Id.* at ¶¶ 7-8.

Decedent's hip could not be surgically repaired because of his medical condition. Relying on the testimony of his treating physician, Dr. David Mercer, Rice claims that Decedent's hip fracture prevented him being ambulatory and his lack of mobility prevented him from being evaluated for a small bowel transplant which ultimately caused his death.

Decedent remained at Nebraska Medical Center until May 6, 2012, when he passed away as a result of respiratory failure, pneumonia, systemic sepsis, and bacterial endocarditis.

On January 28, 2013, this lawsuit was brought on behalf of Decedent's minor children in the Fourth Judicial District Court for the Parish of Ouachita, State of Louisiana, asserting that Decedent's death was caused by Cornerstone's negligence. [Doc. No. 1]. Rice alleges that Cornerstone is liable because it breached its duty to Decedent by the following actions or inactions:

(a)    Improper transfer of patient;

(b)    In failing to timely recognize the severity of [Decedent's] condition;

(c)    In failing to order x-rays;

6

(d)  Failure to properly assess patient;

(e)  Failure to timely and appropriately diagnose;

(f)  Failure to provide appropriate care and management of the patient;

(g)  In failing to recognize, react to, and take timely and appropriate measures to prevent the death of [Decedent];

(h)  In deviating from the acceptable standard of care; and

(i)  In failing to provide medical care consistent with appropriate standards.

[Doc. No. 1-1, ¶¶ 16-17].

On February 20, 2013, Cornerstone removed the case to this Court on the basis of diversity jurisdiction.  [Doc. No. 1].

In prior proceedings, the Court determined that Russo should be given notice of this lawsuit and allowed to pursue claims on behalf of her children.  She declined to do so, and Rice was permitted to proceed on their behalf.

However, Cornerstone propounded Requests for Admissions to Rice on behalf of the children to which he failed to respond.  Pursuant to application of Federal Rule of Civil Procedure 36, *see* [Doc. No. 85], those requests are deemed admitted as a matter law, including the following:

• The Decedent provided the minor children "with no financial support since the date of his single vehicle accident on or about October 28, 2007 through the date of his death."

• From the date of Decedent's "single vehicle accident on or about October 28, 2007," the minor children's "mother and stepfather have provided . . . all financial support and daily care[.]"

• The minor children "have no damages from the claims asserted in this lawsuit."

• The minor children "want this case dismissed."

7

[Doc. Nos. 71-2, 71-3, 85 & 118, p. 4].

## II.    LAW AND ANALYSIS

### A.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment,

identifying each claim or defense--or the part of each claim or defense--on which summary judgment

is sought. The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The

moving party bears the initial burden of informing the court of the basis for its motion by identifying

portions of the record which highlight the absence of genuine issues of material fact. *Topalian v.

Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting

that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of

materials in the record . . . ).  A fact is "material" if proof of its existence or nonexistence would

affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that

a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party

to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19

F.3d 1017, 1023 (5th Cir. 1994).  In evaluating the evidence tendered by the parties, the Court must

accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor.

*Anderson*, 477 U.S. at 255.  However, "a party cannot defeat summary judgment with conclusory

allegations, unsubstantiated assertions, or only a scintilla of evidence. Thus, Summary Judgment is

appropriate if a reasonable jury could not return a verdict for the nonmoving party." *Turner v. Baylor

Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986)); *see also Ruiz v. Whirlpool, Inc.*, 12 F.3d 510, 513 (5th Cir. 1994) ("Testimony based on conjecture or speculation is insufficient to raise an issue of fact to defeat a summary judgment motion because 'there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . .  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'").

### B.    MEDICAL MALPRACTICE AND NEGLIGENCE

Rice alleges that Cornerstone is liable for the negligence of its staff when "entangling [Decedent's] leg and shoulder in such a mann[er] that caused his hip and shoulder to fracture" and under the Medical Malpractice Act for its other alleged failures.  [Doc. No. 110, p. 2].   He further asserts that he can meet his burden as a matter of law by relying on the doctrine of *res ipsa loquitur*, on the obvious negligence of the staff, and the expert testimony of the Decedent's treating physicians at Nebraska Medical Center.

Cornerstone counters that this is solely a malpractice action, that the doctrine of *res ipsa loquitur* is inapplicable, that expert testimony is necessary, that it has produced expert testimony showing the applicable standard of care and that it did not breach that standard, and that the Decedent's treating physicians do not provide the necessary testimony to counter its experts.

### 1.    Classification of Action

"Not every unintentional tort committed by a qualified health care provider falls within the Medical Malpractice Act, only those 'arising from medical malpractice.'" *Williamson v. Hospital Serv. Dist. No. 1 of Jefferson*, 2004-0451(La. 12/1/04); 888 So.2d 782, 783 (quoting LA. REV. STAT. 40:1299.41(l ).  In *Williamson*, the Louisiana Supreme Court listed six factors it had previously identified "to assist a court in determining whether certain conduct by a qualified health care provider constitutes 'malpractice'":

(1)     whether the particular wrong is 'treatment related' or caused by a dereliction of professional skill,

(2)     whether the wrong requires expert medical evidence to determine whether the appropriate standard of care was breached,

(3)     whether the pertinent act or omission involved assessment of the patient's condition,

(4)     whether an incident occurred in the context of a physician-patient relationship, or was within the scope of activities which a hospital is licensed to perform,

(5)     whether the injury would have occurred if the patient had not sought treatment, and

(6)     whether the tort alleged was intentional.

*Id.* at 786-87 (citing *Coleman v. Deno*, 01-1517, p. 17 (La. 01/25/02), 813 So.2d 303, 315-16 (citing Holly P. Rockwell, Annotation, *What Patient Claims Against Doctor, Hospital, or Similar Health Care Provider Are Not Subject to Statutes Specifically Governing Actions and Damages for Medical Malpractice*, 89 A.L.R.4th 887 (1991)).

In *Williamson*, the Louisiana Supreme Court did "not necessarily disagree with the lower courts' findings that the original allegations, at least in part, asserted a malpractice claim, where they "may be reasonably construed to assert a claim of negligence in the 'handling of a patient, including loading and unloading of a patient' . . . in the transportation of the plaintiff by wheelchair to the parking lot of the hospital." *Id.* at 787 (citing *Richard v. Louisiana Extended Care Ctrs., Inc.*, 02-0978, p. 12 (La. 1/14/03), 835 So.2d 460, 468 (allegation that a patient was negligently allowed to fall from her wheelchair might reasonably come within the definition of malpractice because it involves the "handling of a patient, including loading and unloading of a patient.").  However, "any ambiguities in the [Medical Malpractice Act] should be strictly construed against coverage because the Act is in derogation of the rights of tort victims." *Id.* (citations omitted).  The lower courts erred

10

by failing to consider Williamson's amended claims that she was injured as a result of the hospital's negligence when a wheel fell off the wheelchair used to transport her to the parking lot.  Her allegations that the hospital "negligently failed to repair the wheelchair and failed to insure that it was in proper working condition before returning it to service" was neither "'treatment related' nor caused by a dereliction of 'professional skill' within the meaning of the Medical Malpractice Act" and thus asserted a claim of ordinary negligence.  *Id.* at 789-90.

In this case, Rice alleges that Cornerstone's employees incorrectly or improperly transferred the Decedent from a cart to a bed in the hospital setting, that Cornerstone failed to timely recognize the severity of the Decedent's condition, failed to order x-rays, failed to properly assess the Decedent, failed to timely and appropriately diagnose him, failed to provide appropriate care and management, failed to "recognize, react to, and take timely and appropriate measures to prevent the death of [the Decedent], deviated from the acceptable standard of care, and failed to provide medical care consistent with appropriate standards. [Doc. No. 1-2].  These alleged wrongs are unintentional torts that were treatment related and/or caused by a dereliction of professional skill.  The ability to transfer a patient from one surface to another using a draw sheet is not one of ordinary knowledge, nor are any of the other activities cited, and these activities require the assessment of a patient's condition.  Further, all of the alleged wrongs were within the scope of activities which Cornerstone was licensed to perform.[7]  Obviously, if Decedent had not sought treatment, he would not have been transferred from a cart to a bed and the alleged inactions and actions would not have followed that transfer.

---

[7]It is undisputed that the doctors who treated Decedent at Cornerstone were independent contractors, and they would have had to order the x-rays.

Rice relies solely on the second factor of the six-factor test to argue that the bed transfer incident is a claim of ordinary negligence when four other factors squarely favor a finding that this case should be analyzed under the Medical Malpractice Act.   He contends that expert medical evidence is unnecessary to prove that Cornerstone employees acted negligently when the Decedent was allegedly injured in the bed transfer incident and, therefore, this claim is one of negligence, not malpractice.   However, even in a malpractice action, expert testimony may be unnecessary if the negligence would be obvious to a layperson. *See Pfiffner v. Correa*, (La. 1994), 643 So.2d 1228, 1233–34 (Identifying "situations where testimony is not necessary," including "where the physician does an obviously careless act," failing "to attend a patient when the circumstances demonstrate the serious consequences of this failure," an on-call physician's failure to respond to an emergency, "where the defendant/physician testifies as to the standard of care and his breach thereof," or where "the alleged negligence consists of violating a statute and/or the hospital's bylaws.") (citations omitted).   Therefore, a lack of necessity for expert testimony does not in and of itself transform a malpractice action into a case of ordinary negligence.

After review and consideration of the six identified factors, the Court finds that all of Rice's allegations fall within the purview of the Medical Malpractice Act.   The Court now turns to an analysis of his claims under the Act.

## 2.    Medical Malpractice

To recover damages for the independent liability of a hospital in a medical malpractice case, a plaintiff must establish "(1) the standard of care applicable to the defendant health-care provider; (2) breach of the standard of care by the defendant health-care provider; (3) cause-in-fact between the breach and the damages suffered; and (4) actual damages." *Papania v. State ex rel. Bd. of Sup'rs*

*of La. State Univ.*, 2012-0551 (La. App. 4 Cir. 1/9/13), 108 So.3d 256, 259-60; *see also Johnson v. Morehouse Gen. Hosp.*, 2010-0387 (La. 5/10/11), 63 So.3d 87, 96 (a medical malpractice plaintiff must prove the standard of care applicable to the health care provider, a violation or breach of that standard of care, and that the breach caused the plaintiff's injury); *Cangelosi*, 564 So.2d at 661 ("[I]n a medical malpractice action against a hospital, the plaintiff must prove that a hospital caused the injury when it breached its duty. A hospital must exercise that amount of care required by a particular patient, and must protect that patient from external circumstances peculiarly within the hospital's control.") (citing *Hunt v. Bogalusa Community Med. Ctr.*, 303 So.2d 745 (La. 1974)). "Expert testimony is generally required, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony." *Johnson*, 63 So.3d at 96 (citing *Schultz v. Guoth*, 10–0343 (La.1/19/11), 57 So.3d 1002; *Samaha v. Rau*, 07–1726 (La.2/26/08), 977 So.2d 880, 883). "Expert testimony is especially necessary where the defendant in a medical malpractice action has filed a motion for summary judgment supported by expert opinion evidence that the treatment met the applicable standard of care." *Henderson v. Homer Memorial Hosp.*, 40,585 (La. App. 2 Cir. 1/27/06), 920 So.2d 988, 996.

Rice contends that he does not have to offer expert testimony to show the standard of care and breach thereof for two reasons. First, he contends that he can rely on the doctrine of *res ipsa loquitur*. Second, he contends that, with regard to the bed transfer incident, the negligence was so obvious as to render expert testimony unnecessary. The Court will address each of these contentions in turn.

"The principle of res ipsa loquitur is a rule of circumstantial evidence that infers negligence on the part of defendants because the facts of the case indicate that the negligence of the defendant

is the probable cause of the accident, in the absence of other equally probable explanations offered by credible witnesses." *Montgomery v. Opelousas Gen. Hosp.*, 540 S.2d 312, 319 (La. 1989) (citations omitted).  Because it is "'a qualification of the general rule that negligence is not to be presumed,'" it "must be sparingly applied." *Spott v. Otis Elevator Co.*, 601 So.2d 1355, 1362 (La. 1992) (quoting *Day v. National U.S. Radiator Corp.*, 128 So.2d 660, 665 (La. 1961)).  "The court determines the applicability of *res ipsa loquitor* in medical malpractice actions." *Cangelosi v. Our Lady of the Lake Regional Med. Ctr.*, 564 S.2d 654, 660 (La. 11/23/89).   Three elements must be present for the doctrine of *res ipsa loquitur* to apply:

> (1)    the defendant has actual control of the agency, instrumentality or conditions which caused plaintiff's injuries;
>
> (2)    the evidence as to the true cause of plaintiff's loss is more readily accessible to defendant than plaintiff; and
>
> (3)    the accident is of a kind that does not occur in the absence of negligence and/or the circumstances attending the accident create an inference of negligence on the part of defendant.

*Shahine v. La. State Univ. Med. Ctr. in Shreveport*, 28,691 (La. App. 2 Cir. 9/27/96), 680 So. 2d 1352, 1355 (citations omitted).  "The doctrine is not a substitute for factual evidence; it is applied after the factual evidence has been submitted, and then only if there is sufficient circumstantial evidence to suggest that **the only reasonable cause** of the plaintiff's injury is the defendant's breach of the standard of care." *Gisclair v. Bonneval*, 2004-2474 (La. App. 1 Cir. 12/22/05), 928 So.2d 39, 45 (emphasis added).

This case presents several problems in the application of *res ipsa loquitur.*  As to the first criterion, there is a factual dispute as to whether an incident even occurred at Cornerstone.  Rice's theory of the accident clearly relies largely on hearsay because he seeks to repeat statements allegedly

made by Decedent to Rice and his wife, Phyllis Rice, to prove the truth of the matter asserted in those statements.  FED. R. EVID. 801 (hearsay is an out-of-court statement that "the declarant does not make while testifying at . . . trial . . and which is offered "in evidence to prove the truth of the matter asserted in the statement.").  The Federal Rules of Evidence provide certain exceptions from the hearsay rule.  *See* FED. R. EVID. 803 (hearsay exceptions regardless of whether the declarant is available); FED. R. EVID. 804 (hearsay exceptions when the declarant is unavailable).  Rice has not argued that any of the exceptions apply, and the Court's own review of the rules is consistent with Cornerstone's contentions.  Neither of the Decedent's parents were present at the time of the alleged accident, but were allegedly told about it by the Decedent after fact.[8]  Rice believes that he was told of the accident a day or two after it happened, while Phyllis Rice simply does not recall the time. Under these facts, neither the exceptions for excited utterances or present sense impression appear to apply.  FED. R. EVID. 803(1) & (2).  Decedent's account of the alleged incident which caused his injuries is also not offered to show his state of mind, but for the actual truth that the event took place, so the state of mind exception does not apply either.  FED. R. EVID. 803(3).  Therefore, Rice will not be able to present his own testimony or that of his wife at trial to repeat the Decedent's statements to them.

However, one statement appearing in Decedent's medical records as testified to by Dr. Matthew Mormino, the orthopedist at Nebraska Medical Center, is admissible under Federal Rule of Evidence 803(4).  The Decedent "suggested" to Dr. Mormino that "his injury happened

---

[8]Although the testimony of Rice and his wife are generally consistent, there are some inconsistencies in their statements.  Rice testified that his son was injured by two white nurses or nurses' aides who were taking him for dialysis.  [Doc. No. 99-11, Rice Depo., pp. 23-25]. Phyllis Rice testified that "[t]wo black aides, ladies," were the ones who injured the Decedent. [Doc. No. 99-10, p. 29].

approximately two to three weeks prior  . . . [w]hile he was being transferred from a cart to a bed . . . using a draw sheet," that "his feet somehow got tangled, and his hip was moved in an unfavorable position, and his fracture broke at that time.  And likewise, his shoulder was fractured, according to him, at that time as well." [Doc. No. 99-16, Deposition of Dr. Matthew Mormino ("Mormino Depo."), pp. 9-10].   Under Rule 803(4), "[a] statement that is . . .made for–and is reasonably pertinent to–medical diagnosis and treatment . . . and . . . describes medical history; past or present symptoms or sensations; their inception; or their general cause" is admissible.  On the other hand,"[d]etails of the injury not necessary for treatment but serving only to suggest fault 'would not ordinarily qualify' as an exception to the hearsay rule under Rule 803(4)." *Rock v. Huffco Gas & Oil Co., Inc.*, 922 F.3d 272, 277 (5th Cir. 1991).  Cornerstone argues that the statement should be excluded because Dr. Mormino testified that "how things happened" or the "mechanism" of the injuries "didn't really matter to [him]."  [Doc. No. 99-16, pp. 19-20].   However, the Decedent did not appear to attribute liability to anyone in particular, never identifying Cornerstone or its employees.  Rather, his statement appears to fit within the exception as being reasonably pertinent to his medical diagnosis and as a description of his medical history and the general cause of his injury.  Despite his statements otherwise, Dr. Mormino testified that the timing of the injuries was important, and the Decedent's recount was consistent with the type of injuries and with the x-rays. Rice can present this statement to support his contention that an incident occurred at Cornerstone while the Decedent was under its control.

However, even if this statement is sufficient evidence to support one account of the events leading to Decedent's fractures, there are competing theories.  According to Russo, Rice told her that Decedent was injured in the same general manner described in the Cornerstone incident, but that the

incident actually occurred "while [Decedent] was being transferred to his flight to the hospital in Nebraska and more specifically happened when his arm and leg fell off his bed while being transferred to a gurney and somehow resulted in his hip being broken." [Doc. No. 99, Exh. 53, ¶ 7]. She averred further that Rice "specifically advised that the accident and injury to [Decedent] occurred while he was being moved for his flight to Nebraska." *Id.* at ¶ 8.

While it undisputed that the Decedent suffered fractures to his shoulder and hip at some time, the parties have presented conflicting medical testimony as to when the injuries occurred. Rice has presented expert testimony from doctors at Nebraska Medical Center who testified the injuries were between two and four weeks old (when the Decedent would have been in the care of Cornerstone). [Doc. Nos. 90-12, pp. 9-10 & 90-13, pp. 14-15, 20-21]. Cornerstone has presented its own experts, a diagnostic radiologist, who opined that the fractures could have occurred within a few days of Decedent's arrival at Nebraska Medical Center (when the Decedent would not have been in the care of Cornerstone) [Doc. No. 99-38, p. 2] and an orthopedist and rehabilitation expert who reported that the age of the fractures was indeterminate, but that the shoulder injury appeared much older and was "likely due to the 2007 MVA." [Doc. No. 97-29]. Given the uncertainly of the date of the injuries, either theory is plausible, one of which places the Decedent in the control of Cornerstone and one which does not. Further, during the time period, the Decedent was transported by AMR, for which it is not liable and over which it has no control.

Finally, the Decedent himself appeared to change stories on how his injuries occurred. As Cornerstone points out [Doc. No. 99, pp. 29-30], the evidence shows the following inconsistent

17

statements made by the Decedent[9] and Phyllis Rice:

- On the day of his admission to NMC, January 27, 2012, Dr. Lois Wilkinson, a resident, recorded that the Decedent stated, "he had not been able to walk for the last 3 days due to right hip pain secondary to edema." [Doc. No. 99-6, p. 7].

- On the following day, the Decedent's mother told the physical therapist that the Decedent had been unable to move his right leg since he had 70 pounds of water weight "pulled off." [Doc. No. 99-8, p. 109].

- On the day after, January 29th, the Decedent reported that his right leg and hip had been strained by falling off of an x-ray table. [Doc. No. 99-8, p. 1883].

- On the next day, January 30th, the Decedent told his physical therapist that he attributed his right hip pain to fluid retention and "overstretching" during a transfer when in Louisiana. [Doc. No. 99-8, p. 122].

- On the same day, the Decedent reported to his occupational therapist that he had had right hip pain within the "past few weeks" and had not been "out of bed for over a month." [Doc. No. 99-8, p. 119].

- The following day, on January 31st, the Decedent told his physical therapist that it had been "8 to 9 days since his injury" to his hip and shoulder. [Doc. No. 99-8, p. 133].

With the conflicting and multiple plausible theories as to the cause of his injuries and pain, Rice cannot meet his showing on the first criterion.

Further, as to the second criterion, this is not the type case where the defendant had greater access to the evidence. If the incident happened as alleged by Rice, the Decedent was fully aware at the time what happened and who caused his injuries.

Finally, Rice cannot meet his showing as to the third criterion. The Court cannot ignore the undisputed facts of the Decedent's medical conditions in assessing whether this injury is the type that

---

[9]Cornerstone argues that the Decedent's statement to Dr. Mormino is unreliable because of his lack of trustworthiness as a historian. The Court has allowed the statement under the Rule 803(4) hearsay exception, but certainly finds that these inconsistent statements would be allowed into evidence to contradict the one statement made to Dr. Mormino.

does not occur in the absence of negligence.  Certainly, fractures of the hip and shoulder do not occur without incident in otherwise healthy individuals.  The Decedent was not a healthy individual. While Rice denies that Decedent had osteopenia, he does not deny that Decedent had the condition of osteomalacia, which is "a weakening of the bones in this case due to a combination of short bowel syndrome, multiple bowel fistulas, malabsorption, vitamin D deficiency, inactivity and renal failure." [Doc. No. 97-29, Expert Report of Dr. Randolph Taylor ("Taylor Report"), p. 1].  With such a condition, Cornerstone has presented expert testimony that "fractures could occur during the normal course of treatment or normal transfer with no negligence, or even the best medical care due to Mr. Rice's debilitation and osteomalacia." *Id.* at p. 2.  Therefore, the Court cannot conclude as a matter of law that the Decedent's injury was the kind that does not occur in the absence of negligence.

Under these circumstances, the doctrine of *res ipsa loquitur* is not applicable.

"Because res ipsa loquitur does not apply to this case," Rice has "the burden of proving [Cornerstone's] negligence by a preponderance of the evidence."  *Cangelosi*, 564 So.2d at 660-61. Rice next seeks to meet his burden without expert testimony by characterizing this case as one in which negligence is obvious.  The Court disagrees.  The Decedent had serious and complex medical issues with ongoing complaints of pain.  Other than the Decedent's recount of the alleged incident at Cornerstone, Rice seeks to rely on the depositions of the Decedent's treating physicians at Nebraska Medical Center (Drs. Mercer, Mormino, and Stemm) and at Cornerstone (Drs. Lawson and Donald), none of whom testified as to the standard of care or as to a breach of that unidentified standard of care.

In contrast, Cornerstone has presented expert testimony from a nursing expert, a rehabilitation expert, an orthopedic/rehabilitation expert, and a small bowel transplant expert.  The

19

nursing expert, Luanne Trahant ("Trahant"), opined as follows:

> 1)      The standard of care required that Cornerstone and its nursing staff monitor Mr. Rice for complaints of pain and administer medications. The complaints of pain were monitored appropriately and the staff administered pain medications to Mr. Rice. The complaints of pain were known to all of his physicians at the time of his admission to Cornerstone. Dr. Lawson was aware that there were complaints of left arm pain and examined Mr. Rice. Based on his answers to deposition questions, there was no reason, at the time, for him to order any x-rays. X-rays must be ordered by a physician as this would be outside the scope of practice for a nurse.

> 2)      The standard of care required that Cornerstone and its nursing staff provide daily assessments of Mr. Rice and document any changes in his condition. According to the records, multiple nurses, therapists and doctors examined Mr. Rice. There is no evidence in the records that Mr. Rice ever had any bruising or swelling to his left shoulder or right hip. Mr. Rice often complained of pain to his arms, legs, and abdomen. There was only one complaint of pain to his hips and knees and no specific complaints of pain to his right hip while at Cornerstone. Each complaint of pain was documented by the nursing staff and he was assessed and medicated for pain. Subsequent to his complaints of left shoulder pain and a complaint of pain to both of his hips and knees, Mr. Rice participated in therapy including lifting himself using a trapeze bar and participating in hip extension and flexion exercises.

> 3)      The standard of care required that Cornerstone and its nursing staff follow doctor's orders and report any changes to Mr. Rice's physician. A known adverse reaction to low calcium is severe muscle spasms which Mr. Rice exhibited and was known to his physicians.

> It is my opinion based on my experience, education and training that within a reasonable degree of nursing probability, Cornerstone and its nursing staff met the applicable standards of care. The nursing staff provided reasonable care within the standard and Mr. Rice received adequate and appropriate assessments, planning, intervention and evaluations").

[Doc. Nos. 97-26 & 97-27, Declaration and Report of Trahant].

        Cornerstone's rehabilitation expert, Jeff Ellerman ("Ellerman"), provided an affidavit, in

which he averred that he had reviewed the Decedent's medical records, including the physical and

occupational therapy notes and reviewed the deposition transcripts of Padgett, the Decedent's

physical therapist, and Hendrix, the Decedent's occupational therapy assistant.  Based on his review,

Ellerman opined that Padgett and his physical therapy assistant, Jody Chelete, "exercised the degree

of skill ordinarily employed under similar circumstances, by licensed/certified physical therapists

and physical therapist assistants in good standing in the same community or locality, in the

application of their physical therapy skills to their evaluation, care and treatment of Joshua Rice; and

they used reasonable care and diligence in the application of their physical therapy skills to their

evaluation, care and treatment of Joshua Rice." [Doc. No. 97-32, Ellerman Affidavit].  Likewise, he

opined that the occupational therapist, Jennifer Hayner and Hendrix "exercised the degree of skill

ordinarily employed under similar circumstances, by licensed/certified occupational therapists and

occupational therapist assistants in good standing in the same community or locality, in the

application of their occupational therapy skills to their evaluation, care and treatment of Joshua Rice;

and they used reasonable care and diligence in the application of their occupational therapy skills to

their evaluation, care and treatment of Joshua Rice."  *Id.*

Cornerstone's orthopedic and rehabilitation expert, Dr. Taylor, a practicing

orthopedic surgeon, opined that the Decedent's fractures were "more probably than not due to [his

condition of] osteomalacia due to his short bowel syndrome caused by the motor vehicle accident

in 2007" and that "these type of fractures could occur during the normal course of treatment or

normal transfer with no negligence, or even the best medical care due to [the Decedent's] debilitation

and osteomalacia." [Doc. No. 97-29, Taylor Report].  With no knowledge of "any fracture or any

transfer incident," the physical and occupational therapists at Cornerstone "acted within the

standards of care in attempting to help [the Decedent]."  *Id.*

In the face of this evidence, Rice had to present more than a theory that unidentified nurses

or aides at Cornerstone may have caused his fractures when transferring him from a cart to a bed some time in early January 2012.  The Court has considered the testimony of the Decedent's treating physicians at Nebraska Medical Center, but they serve only to support the idea that he could have received the injury in the way Rice asserts, not that the incident occurred or did, in fact, cause his injuries.  Further, as Cornerstone argues, none of these experts establish the standard of care or a breach thereof.

After a review of the entire record in this matter, the Court finds that Rice cannot raise a genuine issue of material fact for trial that Cornerstone breached the standard of care applicable to the Decedent while in its care.[10]  Accordingly, Cornerstone's Motion for Summary Judgment is GRANTED, and Rice's Motion for Summary Judgment on the Issues of Liability and Causation is DENIED.

## C.   DAMAGES

The Court further finds that, even if Rice could proceed with his case on liability and

---

[10]The causal connection between Decedent's hip fracture and his death occurred in "circumstances involving [] complex medical conditions"; therefore, if this case were to go to trial, Rice would also have had to show through either his own experts or those of Cornerstone that the breach of a specified standard of care caused Decedent's death or loss of a chance of survival.  *Pfiffner v. Correa*, 94-0992 (La. 10/17/94), 643 So.2d 1228, 1234.  Rice relies on Dr. Mercer's testimony that the hip fracture had "at least some contribution" to his death and that it was a "fair statement" that he had a better chance of a better outcome if he had not had the hip fracture.  [Doc. No. 99-18, Mercer Depo., p. 40].  Rice's Petition is couched in terms of Cornerstone's causation of his death. Even if Rice is arguing lack of chance of survival, however, Rice does not appear to have expert testimony to support the argument that the hip fracture increased his risk of "harm to the extent of being a substantial factor in causing the result." *Pfiffner*, 643 So.2d at 1230 n.1. (citing Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713, 720 (La. 1986)).  On this, too, Cornerstone presented expert testimony from Dr. Kishore Iyer, a small bowel transplant specialist, that "[t]he occurrence of the fractures themselves seemed to have little to no impact on [the Decedent's] prolonged immobility  . . . or on the occurrence of sepsis that led to [the Decedent's] demise." [Doc. No. 97-31].

causation, he could not meet his burden to prove damages at trial.  Rice has only been permitted to proceed in this matter on behalf of his grandchildren, the Decedent's two minor children.  He acts only to represent their interests and to recover damages on their behalf.  However, it has been deemed admitted as a matter of law that the Decedent had provided the minor children with no financial support since the date of his 2007 motor vehicle accident, that they have no damages from the claims asserted in the lawsuit, and that they want this case dismissed.

Under such circumstances, it is not in the interest of justice for this case to proceed.

III.   **CONCLUSION**

This is a tragic case of a young man whose 2007 car accident resulted in years of pain, surgeries, hospitalizations, and suffering before his death in May 2012.  However, Rice has not raised a genuine issue of material fact for trial that Cornerstone breached the applicable standard of care, causing the Decedent to lose his chance at a small bowel transplant and ultimately caused his death.  Accordingly, Rice's Motion for Summary Judgment on the Issues of Liability and Causation [Doc. No. 90] is DENIED, and Cornerstone's Motion for Summary Judgment [Doc. No. 97] is GRANTED.  Rice's claims are DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 10th day of February, 2016.

**ROBERT G. JAMES**
**UNITED STATES DISTRICT JUDGE**

23